NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOEY MARRERO, | CIVIL ACTION NO. 16-5968 (JLL) |
| Plaintiff, | **OPINION** |
| v. | |
| INTEGRITY HOUSE, INC.; and RAMON MATTIAS, | |
| Defendants. | |

**LINARES**, Chief District Judge

The plaintiff, Joey Marrero, brings this action against the defendants: (1) Integrity House, Inc. (hereinafter, "Integrity House"), which was his employer; and (2) Ramon Mattias, who was his supervisor at Integrity House. (ECF No. 1.) Marrero seeks to recover damages against Integrity House: (1) under the New Jersey Law Against Discrimination (hereinafter, "NJLAD") for disability discrimination (hereinafter, "Count I"); (2) under NJLAD for retaliation linked to his request for an accommodation of his disability (hereinafter, "Count II"); (3) for interference with his rights under the Family and Medical Leave Act (hereinafter, "the FMLA") linked to the termination of his employment after he requested medical leave (hereinafter, "Count III"); and (4) under NJLAD for a hostile work environment linked to comments directed at him by Mattias

concerning Marrero's Puerto Rican heritage (hereinafter, "Count IV"). (ECF No. 1.) In addition, Marrero asserts a claim under NJLAD against Mattias individually (hereinafter, "Count V") based upon the conduct alleged in Count IV. (*Id.*) Marrero also seeks to recover punitive damages under all of the Counts. (*Id.*)

This matter comes before the Court upon the defendants' opposed motion pursuant to Federal Rule of Civil Procedure (hereinafter, "Rule") 56 for summary judgment in their favor on all counts in the complaint, and the plaintiff's opposed cross motion for summary judgment in his favor on Count III on the issue of liability. (*See* ECF No. 26 through ECF No. 26-9; ECF No. 27 through ECF No. 27-6; ECF No. 30 through ECF No. 30-7; ECF No. 31 through ECF No. 31-5; ECF No. 35; ECF No. 36 through ECF No. 36-5.)

The Court resolves the defendants' motion and the plaintiff's cross motion upon a review of the papers and without oral argument. *See* L. Civ. R. 78.1(b). For the following reasons, the Court: (1) grants the defendants' motion insofar as it concerns the portion of Count III that seeks punitive damages; (2) denies the defendants' motion insofar as it concerns the remainder of the complaint; and (3) denies the plaintiff's cross motion.

## I. BACKGROUND

### A. Relevant Employees

Integrity House is in the business of providing treatment to patients with substance abuse issues. In December 2014, Marrero was hired as a maintenance worker by

Integrity House. (ECF No. 1 at 2.) His supervisor was Ramon Mattias, who in turn was supervised by Marvin Deupree. (*Id.*; ECF No. 27-5 at 16 (deposition testimony of Marrero).)

The human resources department (hereinafter, "HR") at Integrity House was staffed by, among others, Victoria Ribon and Jennifer Canterbury. (ECF No. 27-5 at 107 (deposition testimony of Ribon); *id.* at 133 (deposition testimony of Canterbury).)

**B.    Mattias's Comments Concerning Marrero's Heritage**

Mattias identifies himself as possessing full Puerto Rican heritage. (ECF No. 27-6 at 6 (deposition testimony of Mattias).) Marrero alleges that soon after he was hired and then for several months thereafter, Mattias would refer to him in front of other employees as being a "fake f***ing Puerto Rican" because: (1) Marrero identified himself as being of half Puerto Rican heritage; and (2) Marrero did not speak Spanish fluently. (ECF No. 1 at 4; ECF No. 27-5 at 17–18, 30, 32 (Marrero testimony).) Marrero verbally objected to Mattias's conduct to Mattias himself and to Deupree, but the conduct continued. (ECF No. 27-5 at 18, 31.) In February 2016, Marrero submitted a written complaint to HR concerning Mattias's conduct, as well as additional allegations about Mattias stealing and selling scrap metal. (*Id.* at 18–19, 32–34; *see also* ECF No. 31-5 at 2 (Marrero complaint to HR accusing Mattias of commenting that "I am not 100% Puerto Rican").)

Integrity House investigated Marrero's complaint, which included interviews of Marrero and Mattias, and found that the complaint had merit. As a result, on March 30, 2016 Integrity House: (1) purportedly demoted Mattias and took away his supervisory

duties; and (2) directed Marrero to report to Deupree rather than Mattias. (ECF No. 26-4 at 5 (disciplinary letter from Integrity House to Mattias); ECF No. 27-6 at 14 (Mattias testimony); ECF No. 27-5 at 99 (deposition testimony of Deupree); ECF No. 27-5 at 114-17 (Ribon testimony).) Interestingly, Mattias testified that although he was demoted, Integrity House did not lower his salary. (ECF No. 27-6 at 14.)

However, Marrero testified that: (1) neither Deupree nor anyone else at Integrity House told him to report to Deupree directly; (2) he continued to encounter Mattias in the workplace; (3) he was still required to take direction from Mattias on how to perform his maintenance tasks; and (4) Mattias would interrupt him on the job and berate him for being stupid, although Marrero makes no assertions that Mattias had continued to make insulting comments about his heritage. (ECF No. 27-5 at 36-38 (Marrero deposition); *see also id.* at 37 (Marrero testifying, "If he is not my supervisor, if Integrity House states that he is no longer my manager, why is he showing up to my job site and pulling me off of my job site?").)

C.  **Marrero's Timekeeping Issues and Mental Disability**

Marrero apparently suffered from "[p]retty close to chronic lateness" while working at Integrity House. (ECF No. 27-5 at 91 (Deupree testimony).) Deupree issued Marrero a disciplinary memorandum on May 27, 2016 with a copy to Ribon in HR, summarizing the repeated discussions that Deupree had with Marrero about: (1) Marrero's attendance; (2) his punctuality; (3) his failure to properly account for his time on the job by using Integrity House's electronic timekeeping system; and (4) the fact that

4

he had used up all of his sick and vacation time to the point where he was overdrawn by one day. (ECF No. 26-4 at 8–9; *see also* ECF No. 27-5 at 38–44 (Marrero acknowledging the aforementioned discussions in his testimony).) In that same memorandum, Marrero was advised that he was to notify Deupree by phone or text on any day that he would be more than 10 minutes late for work or if he was going to have an unscheduled absence. (ECF No. 26-4 at 8–9.)

On June 8, 2016, Marrero provided a note from a general physician to HR indicating Marrero's need for psychiatric care due to anxiety, and that Marrero was being referred to a psychiatrist. (ECF No. 31-4 at 36; *see also* ECF No. 27-3 at 3 (Marrero's statement explaining the note); ECF No. 31-1 at 4 (defendants' statement agreeing with Marrero's aforementioned explanation).)

Following more unexcused absences from work by Marrero, Deupree issued Marrero a final disciplinary warning in writing on June 10, 2016 with a copy to Ribon in HR. (ECF No. 26-4 at 11–12; ECF No. 27-5 at 44–46 (Marrero's testimony acknowledging and discussing the final warning).) In that final warning, Deupree directed Marrero to notify Deupree solely by a telephone call (and not by a text message) if he were unable to come to work. (ECF No. 26-4 at 12.)

On June 22, 2016, Marrero provided a letter that was dated June 21, 2016 to HR to request to be accommodated for his disability, *i.e.*, "anxiety and depression" (hereinafter, "the Accommodation Letter"). (ECF No. 36-4 at 2; *see also* ECF No. 27-5 at 48 (Marrero testifying that he handed in the Accommodation Letter on June 22, 2016).) In

that letter, he stated that he needed time off to "speak with [his] doctors as need be" or if he is "having a panic attack," and that he "look[ed] forward to meeting . . . to discuss options for accommodating [his] disability." (ECF No. 36-4 at 2.) Integrity House admits to receiving the Accommodation Letter, but argues that the letter did not specifically request a leave of absence as an accommodation for Marrero therein. (ECF No. 26-2 at 17; ECF No. 26-1 at 4; *see also* ECF No. 27-5 at 138–39 (Canterbury from HR testifying that she received Marrero's Accommodation Letter, but that she never received any specific request from Marrero or a doctor requesting a leave of absence before July 5, 2016).) Marrero agreed that he did not seek a leave of absence at that time. (ECF No. 27-5 at 51 (Marrero testimony).)

On June 23, 2016, HR provided Marrero with certain forms under the FMLA, and requested that he fill out those forms that were provided to him in order to provide more information to Integrity House concerning the accommodations for his disability by July 8, 2016. (ECF No. 26-4 at 18–30.)

On June 29, 2016, Marrero was seen by his treating psychiatrist, Dr. Paul Hriso. (ECF No. 27-6 at 77 (deposition testimony of Hriso).) The events surrounding that visit are contested by the parties. However, the parties do agree that Marrero did not report for work on June 29, June 30, or July 1, 2016, even though he was scheduled to work on those days. The parties also agree that Marrero's employment with Integrity House was terminated on July 1, 2016. The resulting termination letter stated that Marrero was terminated because "you did not inform your supervisor you will be absent from work on

Wednesday, June 29, Thursday, June 30 and Friday, July 1, 2016." (ECF No. 31-5 at 4.)

### 1. Marrero's version of events for June 29, 2016 through July 1, 2016

Marrero testified in his deposition that he directly told Deupree a few days before June 29, 2016 that he would be taking off from work on June 29, 2016 to see Hriso, and that Deupree approved it. (ECF No. 27-5 at 52–53, 56; *see also* ECF No. 27-6 at 38 (appointment card from Hriso's office reflecting Marrero's medical appointment for Wednesday, June 29, 2016).) Marrero also testified that he told Mattias. (ECF No. 27-5 at 53.) As a result, Marrero was able to write on an internal calendar kept by the maintenance department that he would be out that day. (*Id.*; ECF No. 31-4 at 70 (maintenance department internal paper calendar reflecting, "Joey Dr's – off").)

Marrero testified that he also told Canterbury in HR that he would need to take off from work on June 29, 2016 in order to see Hriso, that he did so on the same day that he spoke to Deupree about it, and that Canterbury approved the day off for him. (ECF No. 27-5 at 54 (Marrero testifying that "Jennifer [Canterbury] knew I was off on the 29th," and that "[s]he definitely knew that I had an appointment for the doctor more than a week in advance"); *see also id.* at 61 (Marrero testifying to the same).) Furthermore, Marrero testified that he did not enter his day off for June 29, 2016 in Integrity House's electronic timekeeping system because he was inexplicably locked out of accessing the system. (*Id.* at 52–53.)

Deupree confirmed in his deposition that Marrero's day off for June 29, 2016 was noted on the maintenance department's internal calendar, but he could not say for sure

7

when that notation was made. (*Id.* at 89 (Deupree testimony).) However, Deupree also testified that he would have known that Marrero would be off on June 29, 2016 if the note had been written beforehand. (*Id.*)

According to Marrero's testimony, Hriso examined him on June 29, 2016, determined that Marrero suffered from "manic depression," and concluded that Marrero needed to take an immediate leave of absence from work in order to receive treatment for depression, insomnia, and weight loss. (*Id.* at 55.) According to Marrero, Hriso's secretary faxed a note that was written and signed by Hriso to Integrity House (hereinafter, "the Leave Notice") on June 29, 2016 stating the following: "Mr. Marrero is under my care. He will be on sick leave from 6/29/2016 to 7/29/2016," along with supporting documentation. (ECF No. 26-4 at 38 (the Leave Notice); ECF No. 27-5 at 56 (Marrero testimony).) In fact, Marrero testified that on June 29, 2016 he "stood next to the fax machine and waited for [Hriso's secretary]," and then watched her fax the Leave Notice with the other documents. (ECF No. 27-5 at 55–56.)

In addition to not reporting to work on June 29, 2016, Marrero did not report to work on June 30, 2016 or on July 1, 2016. Marrero testified that he did not contact Deupree or anyone else at Integrity House about being out on those days because he was under the impression that Integrity House received the Leave Notice by fax on June 29, 2016 from Hriso's office. (*Id.* at 56, 58–59.)

Marrero was then informed by HR on July 1, 2016 that his employment had been terminated. As Marrero was being treated at Hriso's office when he received the call,

Marrero had Hriso's secretary fax the Leave Notice that he alleges had already been faxed on June 29, 2016. However, Integrity House did not rescind its decision to terminate Marrero's employment.

### 2. Hriso's testimony

Hriso testified that he wrote the Leave Notice on June 29, 2016, but that it would have been faxed by his secretary to Integrity House. (ECF No. 27-6 at 90.) Hriso also testified that a fax cover sheet should have been put in Marrero's file at his medical office if the Leave Notice was faxed on June 29, 2016, but he also testified that the sheet may not have been put in the file in this instance. (*Id.* at 83–84, 91.) However, Hriso indeed faxed the Leave Notice on July 1, 2016 at 4:14 PM, as there is a fax cover sheet and receipt reflecting the same in the record. (ECF No. 31-4 at 108–10 (the Leave Notice with receipt).)

Hriso also testified that his secretary has worked for him for 12 years, and was working for him during the time period in which he was treating Marrero. (ECF No. 27-6 at 77.) The Court notes that the record as presented by the parties for the motion and cross motion for summary judgment is bereft of any certifications, statements, or deposition testimony from that secretary or any other member of Hriso's staff concerning whether the Leave Notice was faxed to Integrity House on June 29, 2016.

### 3. Integrity House's version of events

Canterbury from HR testified that the Leave Notice was not seen by anyone at Integrity House until July 5, 2016 when employees returned to work after a long holiday

9

weekend, and that the Leave Notice was not received by Integrity House on June 29, 2016. (ECF No. 27-5 at 149.) Canterbury also testified that she checked the electronic timekeeping system on July 1, 2016, and she saw that Marrero had not registered to take off June 29, 2016, in addition to June 30, 2016 and July 1, 2016. (*Id.* at 145.) In contrast to Marrero's testimony, she testified that Marrero did not tell her that he had a medical appointment scheduled for June 29, 2016 either on that day or previously. (*Id.* at 148 ("I was not aware of any doctor's appointment that Joey had on June 29th.").)

As a result, according to Canterbury, Integrity House terminated Marrero's employment because he did not report for work on June 29, June 30, and July 1, 2016. (*Id.* at 153–54.)

### 4. Post-termination events

At some point after being terminated by Integrity House, Marrero sought psychiatric treatment from facilities other than those affiliated with Hriso. (ECF No. 27-5 at 75 (Marrero testimony).) Marrero was eventually diagnosed with "Bipolar disorder and adjustment disorder with mixed anxiety / depression," and prescribed medication. (*Id.*)

## II. STANARD OF REVIEW FOR SUMMARY JUDGMENT

It is not necessary for the Court to restate the standard for resolving a motion for summary judgment made pursuant to Rule 56, because that standard has been already enunciated. *See* Fed. R. Civ. P. 56(a) (providing for an award of summary judgment if

there is no genuine dispute of material fact and the movant is entitled to judgment as matter of law); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (setting forth the standard); *United States ex rel. Kosenke v. Carlisle HMA, Inc.*, 554 F.3d 88, 94 (3d Cir. 2009) (setting forth the standard).

Furthermore, the summary judgment standard is not affected when, as is the situation here, the parties file cross motions for summary judgment. *See Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998); *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987).

### III. DISCUSSION

#### A. FMLA Interference as to Integrity House (Count III)

The Court will address Count III first, because it is the basis for the Court's subject-matter jurisdiction and because it is addressed in the defendants' motion and Marrero's cross motion. (*See* ECF Nos. 26–27.)

In order to raise a prima facie case of FMLA interference in the employment context, a plaintiff employee must show that: (1) he was an eligible employee under the FMLA; (2) the defendant is an employer who is subject to the FMLA; (3) he was entitled to FMLA leave; (4) he gave adequate notice to his employer of his intention to take FMLA leave; and (5) he was denied those FMLA benefits. *See Ross v. Gilhuly*, 755 F.3d 185, 191–92 (3d Cir. 2014). The parties dispute whether the fourth and fifth elements are met here. (ECF No. 27-2 at 8–15 (brief in support of Marrero's cross motion); ECF No. 26-2 at 24–26 (brief in support of defendants' motion).)

11

The Court concludes that there are genuine issues of fact as to whether Marrero gave adequate notice to Integrity House of his intention to take FMLA leave in a timely manner, and whether his termination embodied a prohibited denial of those benefits. *See Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 303–05 (3d Cir. 2012) (finding issues of fact remained as to whether the plaintiff employee's notice to the employer for time off was adequate under the FMLA); *Hayduk v. City of Johnstown*, 386 F. App'x 55, 60 (3d Cir. 2010) (holding that it may be left to the trier of fact to decide whether a plaintiff employee has provided adequate notice to an employer of his intention to take FMLA leave). As set forth above by the Court, Marrero asserts that: (1) in the Accommodation Letter, he notified Integrity House about his disability, which was determined to be anxiety and depression at that time, and advised that he would require accommodations for his treatment; (2) both Deupree and HR approved his planned day off from work for June 29, 2016 so that he could see a psychiatrist for treatment; (3) he noted the day off on the internal calendar maintained by the maintenance department; and (4) the Leave Notice was faxed to Integrity House on June 29, 2016 by Hriso's secretary after Hriso assessed Marrero's condition. In contrast, Integrity House asserts that: (1) although Marrero advised in the Accommodation Letter that he would require accommodations for treatment of anxiety and depression, he did not specify that he would require a leave of absence at that time; (2) it had no knowledge that Marrero planned to take the day off on June 29, 2016; (3) Marrero did not note that he would be taking off on June 29, 2016, June 30, 2016, and July 1, 2016 in the electronic

timekeeping system as required; and (4) it did not receive the Leave Notice until July 5, 2016, which was four days after Marrero's employment was terminated. The conflicting evidence and deposition testimony presented here is sufficient to warrant the denial of summary judgment to both sides. *See Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012).

It will be left to a trier of fact to determine: (1) whether the Accommodation Letter put Integrity House on notice that Marrero might need a leave of absence in the near future; (2) whether Marrero was indeed approved to take off from work on June 29, 2016, particularly since his failure to report to work on that day was one of the reasons given by Integrity House for terminating his employment; and (3) whether the Leave Notice was faxed to Integrity House on June 29, 2016, and thus whether Integrity House was given sufficient notice that triggered its obligations under the FMLA. *See Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 402–03 (3d Cir. 2007) (reversing a district court's grant of summary judgment to an employer in an FMLA interference case, because there was a question of fact as to whether the employer had sufficient notice of the employee's intent to take leave even though the employee did not provide certain dates when he would be out due to his illness); *Zawadowicz v. CVS Corp.*, 99 F. Supp. 2d 518, 529 (D.N.J. 2000) (holding that "[g]enerally, the sufficiency of notice [under the FMLA] is a matter for the jury").

However, summary judgment is entered in favor of the defendants only to the extent that Marrero seeks to recover punitive damages under Count III. It is well-settled

law that punitive damages are not available for FMLA interference violations by an employer. *See Brown v. Nutrition Mgmt. Servs. Co.*, 370 F. App'x 267, 270 (3d Cir. 2010) (citing 29 U.S.C. § 2617 of the FMLA); *see also Simonetti v. Broadridge Fin. Sols., Inc.*, No. 10-3903, 2012 WL 32931, at *12 (D.N.J. Jan. 5, 2012) (stating the same).

Therefore, the defendants' motion insofar as it addresses Count III is granted to the extent that it concerns Marrero's claim to recover punitive damages under the FMLA, but it is otherwise denied. Furthermore, Marrero's cross motion is denied in its entirety.

**B.  NJLAD Disability Discrimination (Count I)**

In order to prove discrimination based upon a disability under NJLAD, a plaintiff must establish that: (1) he was disabled; (2) he was performing in the position from which he was terminated; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination. *See Terry v. Town of Morristown*, 446 F. App'x 457, 461 (3d Cir. 2011).

Integrity House argues that it is entitled to summary judgment on this claim because Marrero cannot establish that his termination occurred under circumstances that give rise to an inference of disability discrimination. In support, Integrity House argues the following: "At no time prior to the decision to terminate Plaintiff's employment did Plaintiff request any time off or a leave of absence as a result of his purported disability." (ECF No. 26-2 at 17 (underlining in original).) In sum, Integrity House argues that it was completely unaware of Marrero's need for a leave of absence before he was terminated on July 1, 2016, and that it first became aware of this need four days after Marrero's

14

employment had been terminated.

However, as the Court has set forth at length above, issues of fact remain as to whether the Accommodation Letter put Integrity House on notice about Marrero's disability and that Marrero might require a leave of absence, whether Marrero was granted permission to take off from work on June 29, 2016, and whether Integrity House received the Leave Notice by fax on June 29, 2016. Therefore, issues of fact remain as to whether Marrero's termination was linked to his request for a leave of absence in violation of NJLAD, just as they do for the FMLA interference claim.

In addition, Integrity House argues that it had a legitimate, nondiscriminatory business reason for terminating Marrero's employment, *i.e.*, his repeated late arrivals and unscheduled absences, *including* his purported unexcused absence from work on June 29, 2016. (ECF No. 26-2 at 19.) An employer is required to put forth "a legitimate business reason" for a termination in order to defeat an NJLAD disability claim. *Kohler v. TE Wire & Cable LLC*, No. 14-3200, 2016 WL 1626956, at *6 (D.N.J. Apr. 25, 2016). However, as the Court has addressed above, it is not clear at this juncture whether Marrero's absence on June 29, 2016 was unexcused. Therefore, issues of fact still remain as to whether Marrero's termination was linked to discriminatory intent in violation of NJLAD. *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081–82 (3d Cir. 1996) (holding that a plaintiff employee is permitted to prove discrimination circumstantially in order to set forth a prima facie claim under NJLAD).

### C. NJLAD Retaliation (Count II)

To establish a prima facie claim for retaliation that occurred as a result of a request for a disability accommodation, a plaintiff employee must demonstrate that: (1) he was engaging in protected activity that was known to the employer; (2) his employer took an adverse employment action against him; and (3) the adverse employment action was a result of his participation in the protected activity. *Boles v. Wal-Mart Stores, Inc.*, 650 F. App'x 125, 128 (3d Cir. 2016).

Integrity House argues that its decision to terminate Marrero's employment was not in retaliation for his request for a disability accommodation, but because he did not advise "anyone at Integrity House to let them know he would be absent," and it once again argues that "it did not learn about Plaintiff's need for leave until after his employment was terminated." (ECF No. 26-2 at 23.) However, as discussed above, issues of fact remain on this issue. Therefore, the defendants' motion insofar as it concerns Count II is denied. *See Lichtenstein*, 691 F.3d at 307 (holding there were issues of fact concerning an NJLAD retaliation claim where the employment of the employee plaintiff was terminated seven days after he sought medical leave).

### D. NJLAD Hostile Work Environment (Count IV)

To establish a hostile work environment claim under NJLAD, a plaintiff must show: (1) the complained-of conduct would not have occurred but for his protected trait, such as national origin or ethnicity; and (2) the conduct was severe or pervasive enough to make a reasonable person with the plaintiff's trait believe that the conditions of

16

employment have been altered and the environment is hostile or abusive. *Clark v. Acme Mkts., Inc.*, No. 11-2812, 2014 WL 714898, at *7 (D.N.J. Feb. 24, 2014). However, this is an objective standard, and a plaintiff is not entitled to a workplace that is free of annoyances. *See Nuness v. Simon & Schuster, Inc.*, 221 F. Supp. 3d 596, 601 (D.N.J. 2016) (holding that NJLAD is not intended to be a civility code for conduct in the workplace).

This claim concerns Mattias's comments to Marrero that he was a "fake Puerto Rican," and other comments of a similar nature. In support of summary judgment in its favor, Integrity House argues that it thoroughly investigated Marrero's complaint about Mattias's comments, and that it remedied the situation in Marrero's favor by demoting Mattias and taking away Mattias's authority over Marrero. (ECF No. 26-2 at 29.) However, Marrero argues in response that despite the purported demotion, Mattias still acted as his supervisor, he still took direction from Mattias, and he still had to interact with Mattias in the workplace in general. Furthermore, the Court notes that Mattias testified in his deposition that although he was supposedly demoted, he did not receive a reduction in his salary. Thus, the Court concludes that genuine issues of fact remain on whether Integrity House actually remedied the situation and alleviated the allegedly hostile environment being experienced by Marrero due to Mattias's conduct.

Integrity House also argues that Marrero's hostile work environment claim is undermined by the fact that both Marrero and Mattias are members of the same protected class, *i.e.*, they are both of Puerto Rican descent, and thus Mattias's comments cannot be

construed as being discriminatory. (ECF No. 26-2 at 30.) However, although the fact that Mattias is also Puerto Rican may weaken any inference of discrimination raised by Marrero on this issue, it certainly does not completely preclude Marrero from succeeding on his claim. *See Burch v. WDAS AM/FM*, No. 00-4852, 2002 WL 1471703, at *7 (E.D. Pa. June 28, 2002) (holding the same).

Finally, Integrity House argues that Marrero has not set forth "any specific factual allegations as to how Matias' [*sic*] alleged conduct affected the terms and conditions of his employment" because "Integrity House took swift action, investigated Plaintiff's complaint, and ultimately removed Matias [*sic*] from his supervisory role over Plaintiff." (ECF No. 26-2 at 30–31.) However, as set forth at length above, Marrero has presented evidence that the hostility expressed by Mattias was pervasive and weighed upon him during his workday, and Marrero has raised issues of fact as to whether Mattias was actually removed from his supervisory position over Marrero.

Therefore, the Court denies the defendants' motion insofar as it concerns Count IV.

### E.    NJLAD Hostile Work Environment Claim against Mattias (Count V)

NJLAD holds an employer liable for discriminatory conduct, and only holds an individual liable for aiding and abetting discrimination in the workplace. *See* N.J.S.A. 10:5-12(a), (e).

As to this claim that Marrero asserts against Mattias, the defendants first argue that Marrero has not pleaded an aiding-and-abetting claim in the complaint. (ECF No. 26-2 at

35.) That is not correct. (*See* ECF No. 1 at 8 (Marrero's complaint citing N.J.S.A. 10:5-12(e), which provides for aiding-and-abetting liability under NJLAD).) Furthermore, because Count IV, which is asserted against Integrity House based upon Mattias's underlying conduct, has survived summary judgment, it necessarily follows that Count V must survive at this juncture. *See Fado v. Kimber Mfg., Inc.*, No. 11-4772, 2016 WL 3912852, at *8–9 (D.N.J. July 18, 2016) (holding that a supervisor can be held personally liable for his own conduct under the aiding and abetting provision of NJLAD). Therefore, the defendants' motion insofar as it addresses Count V is denied.

### F. Punitive Damages

In contrast to the FMLA, an award of punitive damages is available under NJLAD if the plaintiff proves that the employer actually participated in or showed willful indifference to the wrongful conduct, and that the wrongful conduct was especially egregious. See *Boles*, 650 F. App'x at 129 (holding the same).

The defendants seek summary judgment in their favor to the extent that Marrero seeks to recover punitive damages for his NJLAD claims, and argues that Marrero has not demonstrated that the defendants engaged in "especially egregious conduct." (ECF No. 26-2 at 38 (internal quotes omitted).) However, that determination must first await a final determination by a trier of fact as to whether the defendants are liable for NJLAD violations, and then the issue of whether the defendants' conduct merits an award of punitive damages to Marrero can be addressed. *See Turner v. Schering-Plough Corp.*, 901 F.2d 335, 346 (3d Cir. 1990) (holding that it is the trier of fact that must first make a

finding of discriminatory conduct, whereupon a trier of fact will then determine whether the underlying conduct was either outrageous or merely negligent); *see also Milelli v. Collingswood Bd. of Educ.*, No. 16-963, 2018 WL 1535210, at *7 (D.N.J. Mar. 29, 2018) (holding that in an NJLAD case, "[t]he issue of punitive damages is generally a question of fact for the jury"). Therefore, that part of the defendants' motion is denied.

## IV. CONCLUSION

For the aforementioned reasons, the Court: (1) grants the defendants' motion insofar as it concerns the portion of Count III that seeks punitive damages; (2) denies the defendants' motion insofar as it concerns the remainder of the complaint; and (3) denies the plaintiff's cross motion. An appropriate order follows this opinion.

Date: September 17th, 2018

**JÓSE L. LINARES**
Chief Judge, United States District Court